UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                      :

**FINANCIAL CASUALTY & SURETY, INC.,**
                      :

           Plaintiff,
                      :    **MEMORANDUM DECISION AND**

                      :    **ORDER**

      - against -
                      :

                      :    12 Civ. 3476 (AMD) (RLM)

**GEORGE ZOUVELOS &**
                      :

**ANASTASIA MANCINI,**
                      :

           Defendants.

-------------------------------------------------------------- X

**ANN M. DONNELLY,** District Judge.

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 29 2016 ★

BROOKLYN OFFICE

## BACKGROUND

This contract dispute arises out of the issuance of bail bonds. The plaintiff, Financial Casualty &
Surety, Inc. ("FCS"), filed this action against the defendants, spouses George Zouvelos and Anastasia
Mancini, for breach of contract and breach of fiduciary duty. Through a series of contracts, FCS
authorized Zouvelos, then a licensed bail agent, to write FCS-insured bonds. Mancini is a signatory to
the final contract, which lists her as Zouvelos' indemnitor. The plaintiff alleges that the defendants
misappropriated collateral funds and failed to satisfy bond forfeiture judgments, thereby breaching the
terms of their contract. The defendants contend that the final contract is void and unenforceable, that
Zouvelos did not breach the terms of any contract with FCS and that, to the extent he did, he shares
liability with indemnitors who signed the prior contracts—not Mancini. Additionally, Zouvelos asserts a
counterclaim against the plaintiff for money that he claims to be owed pursuant his agreements with
FCS. For the reasons that follow, I find in favor of the plaintiff and order the defendants to pay damages
in the amount of $242,665 plus reasonable attorneys' fees and costs of litigation.

1

## PROCEDURAL HISTORY

This action has a "lengthy[] and acrimonious[] history," (Memorandum and Order by Judge Lee Rosenthal, ECF 101), which I recite only in relevant part. FCS filed a complaint against Zouvelos and Mancini in the Southern District of Texas on July 6, 2011. (ECF 1.) On February 1, 2012, the defendants answered the plaintiff's complaint, asserted counterclaims, and moved to transfer the case to the Eastern District of New York, where they reside. (ECF 57.) Judge Lee Rosenthal granted that motion on July 13, 2012. (ECF 101.)[1] The case was assigned to Judge William F. Kuntz, II, who granted the plaintiff's motion dismiss the defendants' counterclaims. (March 27, 2013 Order.) The parties filed dispositive motions, all of which were denied. (Apr. 1, 2014 Order Denying Plaintiff's Motion for Summary Judgment; Order Denying Defendants' Motion to Dismiss and Motion for Summary Judgment, ECF 209; Order Denying Defendants' Motion for Reconsideration, ECF 215.)[2] On January 8, 2015, the plaintiff filed an Amended Complaint. (ECF 198.) This case was assigned to me on November 5, 2015. I held a bench trial on November 14, 16 and 17 of 2016. Thereafter, the parties submitted proposed findings of fact and conclusions of law. (ECF 262, 263.)

## FINDINGS OF FACT

At trial, witnesses for the plaintiff included Zouvelos, Mancini, and Michael Padilla, who worked at FCS from 2010 to 2015 and ultimately served as its vice president. (Trial Transcript ("TR") 4, 24.) Additionally, the plaintiff introduced business records, collateral receipts, and reports by an attorney

---

[1] The defendants filed a defamation claim against the plaintiff in New York state court, but the New York Supreme Court dismissed the case on January 22, 2013. (ECF 150.)

[2] On April 8, 2016, the defendants filed a motion to implead several parties whom they claimed to be indemnitors. (ECF 237). I denied that motion as untimely. (Apr. 11, 2016.) Then, the defendants filed suit against the very same parties they sought to implead, as well as FCS. *See Zouvelos v. Surety Financial of America, Inc. et al*, Case No. 16-cv-1851. That case remains pending before me.

and a hearing officer for the New York Department of Financial Services ("NYDFS"). The defendants introduced one exhibit, Padilla's affidavit, and did not call any witnesses.[3]

I did not find the defendants' testimony to be credible. As explained in greater detail below, Zouvelos and Mancini were evasive, and their testimony was internally contradictory, contrary to the record evidence, and inconsistent with their deposition testimony. (TR 287-88, 301-07, 314-18, 340.) Additionally, in at least one instance, Zouvelos changed his answer to a question only after it was repeated several times. (TR 331-33.)

In contrast, I credit Michael Padilla's testimony, which was consistent and supported by New York Department of Financial Services (NYDFS) hearing reports and state court records regarding Zouvelos' bail bond business. Moreover, the defendants did not contest many of Padilla's material representations: Mancini affirmed that she signed the contract at issue (TR 311); Zouvelos affirmed that he used his own collateral receipt forms rather than FCS's required forms (TR 316); and both defendants affirmed Zouvelos charged consulting fees and third-party vendor fees against the indemnitors' collateral. (TR 287-89, 328-31, 337.)

---

[3] On February 19, 2016, Magistrate Judge Go ordered the defendants to "produce a list of individuals that they may use to support their claims or defenses" as well as "a list of categories of documents that they may use to support their claims or defenses, and a computation of each category of damages claimed on their counterclaims." (Feb. 19, 2016 Minute Order.) She warned the parties that "they must produce all responsive discovery by 3/4/16 or be precluded from using any documents not produced, except for documents they received after 3/4/16." (*Id.*) The defendants did not comply with that order. (*See* Plaintiff's Letter in Preparation for Phone Conference, ECF 232.) On March 28, 2016, Judge Go directed the defendants to provide a witness list by April 22, 2016. (March 28, 2016 Minute Entry.) On May 17, 2016, the plaintiff filed a motion for discovery relief, noting that the "universe of records produced by Defendants [wa]s neither numbered nor identified in responses to requests for production." (ECF 241 ¶ 2.) By the time the parties filed an Amended Joint Pre-Trial Order (JPTO) on September 26, 2016, the defendants still had not identified their exhibits with specificity. (ECF 246.) I ordered the parties to submit a revised JPTO that identified the defendants' list of proposed exhibits. (Oct. 24, 2016 Order.) The defendants' exhibit list did not adequately identify the documents on which they intended to rely. (*See* ECF 247.) Accordingly, I granted the plaintiff's motion to limit the evidence at trial to the documents the plaintiffs had already produced and BATES-stamped; I also ordered the defendants to identify their proposed exhibits by BATES number at an October 31, 2016 Pre-Trial Conference. (Oct. 28, 2016 Order Granting the Plaintiff's Motion for Discovery Relief.) Again, they failed to do so. Without providing any notice to the plaintiff, the defendants attempted to introduce exhibits at trial that were not BATES-stamped and which the plaintiff had never seen. (TR 229-31, 244-45, 262-63.) I declined to admit those exhibits which, given the lack of notice, would have been prejudicial to the plaintiff. At the end of trial, I directed the parties to provide a list of agreed-upon admissions regarding exhibits that were identified prior to trial and prepared for trial, but not entered into evidence during trial. The parties agreed to admit the plaintiffs' exhibits 1-4 and 6-54, but they did not agree to admit any additional exhibits that the defendants submitted. (ECF 260.)

This lawsuit boils down to a question of contract interpretation. Based on my review of the evidence presented, including the relevant contracts between the parties, I find that Zouvelos breached the terms of the parties' agreements. Among other things, Zouvelos failed to satisfy bond forfeiture judgments that arose out of FCS-insured bonds that he wrote, did not adequately record his acceptance and dispersal of collateral funds, and used collateral funds to pay third-party vendors—including a company that Mancini owned and operated out of Zouvelos' office—for routine services that were part of his general duties as a bail bondsman. Furthermore, I find that Mancini is jointly liable for damages resulting from the breach because she signed the final contract between the parties and, in so doing, agreed to indemnify Zouvelos for any liability arising out of his bail bond business relationship with the plaintiff.

I. **The Bail Bond Business in New York**

In New York, a criminal defendant who does not have enough money to post bail may seek a bail bond, which requires an obligor to submit a portion of the bail and agree to pay the rest if the defendant fails to appear in court. (TR 25); *see also* N.Y. Crim. Proc. Law § 520.20-1(a) (McKinney). A bail agent serving as an obligor secures collateral from an indemnitor, generally a friend or family member of the defendant, before posting the bond. (TR 25.) An insurance company bail bond is one in which a bail agent is backed by a surety-obligor. (TR 26) (Pl. Ex. 54, at 2); *see also* N.Y. Ins. Law §§ 6801, 6802 (McKinney), N.Y. Crim. Proc. Law § 520.20-4(a) (McKinney).

If a defendant appears in court, surrenders himself to custody, or the criminal action is terminated, the bond is exonerated. (TR 54-55) (Pl. Ex. 54, at 3 (citing N.Y. Crim. Proc. Law §§ 520.20-3, 530.80-1, 170.25-2, 190.75 (McKinney)). This means that the bail agent gets his money back and, in turn, the indemnitor retrieves his collateral minus a "premium" fee, the amount of which is capped, by

statute, at 10 percent of the bond. (TR 55, 106, 330); *see also* N.Y. Ins. Law § 6804 (McKinney).[4] If the defendant does not appear in court, the bond is forfeited and the bail agent may charge the collateral for reasonable costs and fees related to securing the defendant's appearance. (TR 101-03) (Pl. Ex. 54, at 17.)

## II. Michael Padilla's Testimony

Michael Padilla, who had been in the bail bond business for 34 years, worked at FCS from 2010 to 2015, ultimately serving as a vice president. (TR 4, 24.)[5]

### a. FCS's Business Relationship with Zouvelos

FCS is a surety company that contracted with Zouvelos, then a licensed bail agent in New York. (TR 25-27.) As such, he had an appointment through New York State to serve as a bail agent, and also had a contract with FCS. (TR 26.) Ultimately, FCS is liable to both courts and indemnitors. If a defendant fails to appear and Zouvelos does not pay the bond forfeiture judgment, the court enters a judgment against the surety. (TR 204-06.) Likewise, if a bail agent fails to return an indemnitor's collateral upon the exoneration of a bond, FCS is liable to the indemnitor. (TR 74.) Under these circumstances, FCS could seek reimbursement from Zouvelos, according to the terms of their contract. (46-47.)

---

[4] Specifically, New York Insurance Law provides the following:

> The premium or compensation for giving bail bond or depositing money or property as bail shall not exceed ten per centum of the amount of such bond or deposit in cases where such bonds or deposits do not exceed the sum of three thousand dollars. Where such bonds or deposits exceed the sum of three thousand dollars, the premium shall not exceed ten per centum of the first three thousand dollars and eight per centum of the excess amount over three thousand dollars up to ten thousand dollars and six per centum of the excess amount over ten thousand dollars. In cases where the amount of the bond or deposit is less than two hundred dollars a minimum premium of ten dollars may be charged.

N.Y. Ins. Law § 6804 (McKinney).

[5] At the time of trial, Padilla had left FCS and was a vice president at Accredited Surety and Casualty.

Padilla testified that FCS required bail agents to adhere to certain procedural requirements, but also granted agents discretion to assess risk and set collateral amounts accordingly. An indemnitor seeking a bond from a bail agent filled out FCS's form application. (TR 29.) If the bail agent determined the indemnitor to be an acceptable credit risk, the indemnitor paid the premium fee and deposited with the bail agent the required amount of collateral, which was generally a percentage of the bond amount. (TR 30.) FCS took a cut of the premium, as did any general agent listed on the contract, and the bail agent would keep the rest. (TR 30-31.)

Once the indemnitor paid the premium, the parties executed three required bail bond forms: the collateral receipt, the premium receipt, and the power of attorney. (TR 32.) The latter is submitted to the court in order to trigger the release of the defendant; the premium receipt goes either to the defendant or the indemnitor, as verification that he paid the bail agent for his services; and three copies of the collateral receipt are distributed to the indemnitor, the agent, and the surety, respectively. (TR 32-34.)

FCS retains the pink carbon copy of the collateral receipts, and refers to these documents as "the pinks." (TR 32-34.) FCS relies on the pinks to know how much collateral its agents have collected. (TR 34-35.) Additionally, FCS requires agents to use its bail bond form, as well as other standardized forms including receipt books, indemnitor checklists, applications, and documents for recording real property as collateral. (TR 35.)

According to Padilla, bail agents are not entitled to charge fees against an indemnitor's collateral if the bond in question does not forfeit; under those circumstances, any work an agent does to monitor the defendant—including having a defendant on bail "check in" with the office—is a cost of doing business as a bail agent. (TR 102-03.) Until Padilla met Zouvelos, he had not heard of bail agents charging consulting fees. (TR 103-04.)

Once or twice a month, agents send reports to FCS, along with the pink collateral receipts. (TR 56.) Agents are supposed to report when bonds are discharged and collateral has been returned. (TR 56-58.) Once the bail agent receives collateral, he is contractually required to deposit the money in a segregated account designated for collateral funds alone. (TR 39-40.)

### b. The Contracts Between FCS and Zouvelos

From 2008 through 2010, FCS and Zouvelos entered into four agreements by which Zouvelos operated a bail bond service and FCS functioned as an authorized surety for the bonds. (Pl. Ex. 1-4) (TR 27, 42, 44, 111.) Each agreement "supersede[d] and cancel[led] all prior... agreements...with respect to or in connection with the subject matter" of the contract. (Pl. Ex. 2 ¶ 33, Ex. 3 ¶ 32, Ex. 4 ¶ 31.)

Zouvelos' first contract with FCS was a "sub-producer bail bond agreement" dated April 20, 2008. (Pl. Ex. 1.) The contract included Julio Pozo as a general agent and George Zouvelos as sub-producer and indemnitor. (*Id.*) It remained operative for just 11 days, after which the parties entered into a second contract that described Zouvelos as a "supervising agent," and replaced Mr. Pozo with Michelle Renshaw as a general agent. (Pl. Ex. 2.) The third contract, dated July 5, 2009, removed Ms. Renshaw's name and listed Zouvelos as the general agent and general agent indemnitor. (Pl. Ex. 3.) The final contract ("2010 contract") listed Zouvelos as a "Producer" and listed defendant Anastasia Mancini, Zouvelos' wife, as a "Producer Indemnitor." (Pl. Ex. 4) (TR 42-46, 111-16, 225.) The agreements were all substantially similar, but not identical.

The agreements set forth several recordkeeping and accounting requirements that Zouvelos was expected to follow. Zouvelos had discretion to determine the amount of collateral required for each bond, (TR 36) and could write any bond up to $50,000 without obtaining authorization from FCS. (TR 37-38.) He was responsible for processing each bond application, receiving the applicable fees, maintaining the collateral, and returning the collateral to indemnitors once a bond was exonerated. (TR

119-20) (Pl. Ex. 1 ¶¶ 7-10, Pl. Ex. 2 ¶¶ 7-10; Pl. Ex. 3 ¶¶ 7-10; Pl. Ex. 4 ¶¶ 7-10.)[6] Additionally, the agreements required Zouvelos to retain copies of all collateral receipts, indemnity agreements, and contracts for bail bonds. (TR 29) (Pl. Ex. 1 ¶ 14, Pl. Ex. 2 ¶ 14, Pl. Ex. 3 ¶ 14, Pl. Ex. 4 ¶ 14.) Moreover, he was to maintain three separate bank accounts: one for collateral funds, to be held in a fiduciary capacity for FCS and returned to indemnitors once a bond was exonerated; another for premium funds, which were the profits shared between Zouvelos, FCS, and any other general agent listed on the contract; the third was for Build Up Funds ("BUF")—a percentage of Zouvelos' profits that FCS could seize if Zouvelos' bonds forfeited, in order to cover the cost of the judgments. (*Id.*) (TR 46-49.)

The agreements also expressly provided that Zouvelos would indemnify FCS and hold FCS harmless for all losses and liability related to bond forfeiture judgments for bonds that he wrote, (Pl. Ex. 1 ¶ 24, Pl. Ex. 2 ¶ 25, Pl. Ex. 3 ¶ 25, Pl. Ex. 4 ¶ 24), and for losses of collateral attaching to that liability. (*Id.* ¶ 17; *see also id.* ¶¶ 7, 9, 14, 18) (TR 166.) Further, the agreements specified that Zouvelos would comply with all New York laws, (Pl's Ex. 4, ¶ 3) and would indemnify FCS for all costs, expenses, and liabilities FCS sustained in connection with Zouvelos' bail bond business. (*Id.* ¶¶ 17-20.)

The 2010 agreement specified that Zouvelos and Mancini were "fully liable to [FCS] for the bonds written by, as well as the acts and/omissions of, Producer [Zouvelos], Producer's employees, and independent contractors." (*Id.* ¶ 1.) Additionally, the contract provided that Zouvelos and Mancini were "liable to [FCS] for all liabilities, claims, and demands, without limitation, which arise from or relate to bail bond Powers of Attorney entrusted to [Zouvelos] by [FCS]...." (*Id.*) As with the prior contracts, the final contract expressly superseded all other agreements regarding Zouvelos' agency appointment with FCS. (*Id.* ¶ 31.)

---

[6] In the first contract, which was operative from April 20 to May 1 of 2008, the "General Agent"—Julio Pozo—was to "insure that [Zouvelos would] solicit, collect, protect, insure, return, apply and deliver...collateral" to FCS, as directed by FCS. (Pl. Ex. 1 ¶ 7.) In each subsequent contract, Zouvelos was responsible for "insur[ing]" his compliance with these restrictions. (Pl. Ex. 2 ¶ 7, Ex. 3 ¶ 7, Ex. 4 ¶ 7.)

c. FCS's Discovery of a Collateral Shortfall

FCS became concerned about Zouvelos' business operations in April of 2009, when Zouvelos transferred to FCS a lump sum of $600,000 in collateral funds. (TR 50-52) (Pl. Ex. 15.) Padilla testified that it was typical for bail agents to transfer collateral funds to FCS periodically, but that Zouvelos' transfer was atypical because he provided no information about the origin or breakdown of the collateral funds; in other words, FCS could not determine which indemnitors contributed to this $600,000 figure, or in what amounts. (TR 50-61.)

In May of 2010, after he had been working for FCS for approximately five months, Padilla went to New York so that he could meet Zouvelos, investigate these collateral reporting and return problems, and add Mancini—who married Zouvelos in February of 2010— to the contract as an indemnitor. (TR 61-63, 112-14.) Padilla testified that it was his regular business practice to include spouses as indemnitors for agency contractors so that in the event of a dispute, the contractors could not hide agency assets under a spouse's name. (TR 112-14.) While in New York, Padilla gave Zouvelos a contract for both defendants to sign and return to FCS. (TR 233-34.)

Padilla discovered that Zouvelos did not use FCS's required pink collateral receipt forms to track his receipt or dispersal of collateral. (TR 58.) During his visit to Zouvelos' offices, Padilla examined Zouvelos' records and found four spreadsheets that included information about Zouvelos' bond files. (TR 68-73.) He took Zouvelos' accounting spreadsheets and other records back to FCS, so that he could consolidate the information into one spreadsheet that tracked all of Zouvelos' collateral liability. (Pl. Ex. 18A) (TR 68-73, 272-76.) When he compared this spreadsheet with the information FCS had on record from the pinks, (Pl. Ex. 14), he found that the records were inconsistent. (TR 165-67.)

Additionally, Padilla discovered that Zouvelos had a practice of charging third-party vendor fees and "consulting" fees against indemnitors' collateral funds. (TR 58-59, 81-82.) These third-party vendors included Mancini's company, New York Cut Slips and Transcripts ("NYCT"). (*Id.*) For example, one collateral request form indicated that the indemnitor put up $2700 in collateral, but Zouvelos requested that only $1600 be returned to the indemnitor. (TR 75-77) (Pl. Ex. 36.) According to the form, Zouvelos claimed the rest of the money as fees for "confirm[ing] bail exoneration" and for "defendant contractual [failure to appear] inquiries." (TR 76.) These fees were assessed on top of Zouvelos' premium fee of $860. (TR 76-77.) When Padilla questioned Zouvelos, he claimed that he entered into private contracts with defendants and their indemnitors, and that the contracts authorized him to charge the collateral in this manner. (TR 80-81.)

Padilla also noticed cases in which Zouvelos charged these fees even though the bond did not forfeit. (TR 101, 155.) He testified that he was confused by this practice. He did not understand why Zouvelos "ha[d] to hire a bounty hunter" or other third party vendor if the defendant made all required appearances. (TR 101.) Padilla explained that any cost of "going to monitor" defendants was "just part of doing business" and he had "never seen anybody get charged for it." (TR 103-04; 80-86.)

At the direction of FCS president Robert Sabo, Padilla seized $190,000 in collateral funds from Zouvelos. (Pl. Ex. 15) (TR 65-66.) At that point, FCS took over responsibility for returning collateral to indemnitors after bonds were exonerated. (TR 104-05,132-33, 263-64) (Pl. Ex. 36.) In August of 2010, FCS president Robert Sabo terminated FCS's relationship with Zouvelos. (TR 236-37.)[7] Although Zouvelos was no longer writing bonds for FCS, he continued to submit collateral request forms in order to close out existing bonds as they were exonerated. (TR 118-19.) Based on these forms, FCS became

---

[7] Mr. Sabo sent Zouvelos a letter confirming the termination in October of 2010, but Padilla signed an affidavit stating that the 2010 contract was terminated in August. (TR 235-37.) At trial, Padilla recalled that FCS sent Zouvelos an email prior to mailing the letter. (TR 94.)

aware that there would be a collateral shortfall: that is, that Zouvelos was disbursing more collateral than he took in. (*See, e.g.*, Pl. Ex. 7, 10) (TR. 84-85.) Padilla tried to obtain Zouvelos' bond files in order to address the discrepancies in his records, but Zouvelos reported that the bond files were destroyed in 2009, when a pipe containing sodium bromide burst over certain files, causing the ink to disappear. (TR 98-101.)[8] Additionally, Padilla requested a copy of the private contract that Zouvelos executed with defendants and their indemnitors, but Zouvelos refused to turn it over. (TR 80, 81, 87-88.)

Ultimately, FCS stopped reimbursing Zouvelos for any third-party fees charged against the collateral. (TR 80, 104, 132-133).[9] Instead, for each collateral request, FCS sent checks made out to indemnitors for the amount that Zouvelos claimed they were due, but held the remainder that was supposedly owed the third party vendor, and requested that Zouvelos submit documentation confirming that he delivered the checks to the indemnitors. (TR 104-06, 132-33) (Pl. Ex. 36.) In some cases, FCS obtained documentation directly from courts. (TR 121-22.)

FCS received phone calls and letters from indemnitors who claimed Zouvelos would not release the collateral checks to them, (TR 106-107, 269) and in some cases issued checks directly to these individuals. (Pl. Ex. 37) (TR 131-32, 269.)

### d. The NYDFS Investigation

In the summer of 2011, Padilla and Mandi Krasney of FCS met with Michael S. Formichelli, an NYDFS attorney, and Juan Peña, an NYDFS investigator. (TR 89.) Mr. Formichelli and Mr. Peña informed the FCS representatives that NYDFS received "numerous complaints" about Zouvelos' failure to return collateral. (TR 90.) NYDFS provided FCS with a copy of the private contract that Zouvelos

---

[8] This was the first that Padilla had heard of the flood, despite having met with Zouvelos months before. (TR 99-101.) Zouvelos never provided documentation of the flood. (TR 242-43.)

[9] FCS issued checks for expense reimbursement directly to Zouvelos and did not pay third-party vendors directly. (Pl. Ex. 21) (TR 227-28; 265.) Padilla did not approve any third-party vendor invoices, (TR 228-29, 232, 260-61), nor did he personally issue checks or review them before they were sent to Zouvelos. (TR 260-61.)

used with defendants and indemnitors. (TR 80, 87-91; 240.) Padilla testified that this was the first he had seen the contract; previously, Zouvelos refused to provide a copy because he contended that it "had nothing to do with FCS." (TR 88-89.)

Padilla testified that NYDFS was "looking [to FCS] to make the indemnitors whole on their collateral." (TR 90.) NYDFS asked FCS to conduct an audit of Zouvelos' business, but Zouvelos refused to cooperate. (TR 91-93.)

### e. Padilla's Damages Calculations

FCS has tried to calculate the collateral shortfall in this case, despite the fact that Zouvelos has provided no reliable records and has stopped sending FCS collateral return requests. (TR 189) (Pl. Ex. 25.)[10] In the course of this litigation, Judge Rosenthal ordered the defendants to provide additional information about the cash collateral they held, so that FCS could "reconcile and disburse" the collateral to the proper recipients. (ECF 39) (TR 134-35.) In response, Zouvelos provided FCS with a spreadsheet ("Zouvelos' Collateral Spreadsheet") that lists bond numbers, defendants' names, the amount paid on the bond, fees charged against the collateral, and whether/how much of the collateral was returned to the indemnitors. (Pl. Ex. 18B) (TR 134-35.) Padilla reviewed Zouvelos' spreadsheet and found it to be inaccurate. (TR 136, 158-74.) Additionally, the plaintiff introduced several collateral request forms and collateral receipts that contradicted the information on the spreadsheet. (Pl. Ex. 24, 27-51) (TR 148-149, 152, 176.)

Generally, FCS is able to track the collateral received and disbursed by its bail agents based on the pink collateral receipts that the agents are directed to use. According to the pinks that Zouvelos submitted to FCS, he received a total of $1,839,010 in cash collateral from indemnitors on FCS bonds.

---

[10] Zouvelos claims no other indemnitors who were owed collateral have contacted him, even though FCS still has over two hundred thousand dollars of unclaimed collateral in its account. (TR 180, 351.) He testified that he could not force people to pick up their money, and that the litigation between him and FCS prevented him from returning collateral. (TR 352-53.)

(Pl. Ex. 14) (TR 54-55, 166.) This figure is incorrect, however, since—as discussed above—Zouvelos did not use the pinks.

Padilla compared Zouvelos' Collateral Spreadsheet (Pl. Ex. 18B) and the collateral requests he submitted to FCS, and found that Zouvelos withheld collateral from indemnitors, wrongfully charged fees against indemnitors' collateral and, in some cases, returned more collateral than the indemnitor initially deposited, thereby causing a collateral shortfall. (TR 138-72.) Padilla determined that Zouvelos misappropriated collateral submitted by the following indemnitors:

1. Joann Rivera (Pl. Ex. 24);
2. Francisco Aurich (Pl. Ex. 27);
3. Telisha Mathews (Pl. Ex. 28);
4. Steve Aslan (Pl. Ex. 29);
5. Attareb Yasina (Pl. Ex. 30) (TR 138-143);
6. Marlene Gayle (Pl. Ex. 31) (TR 144-147);
7. Luna Attagracia (Pl. Ex. 32) (TR 147-149);
8. Gloria Torres (Pl. Ex. 33);
9. Joanne Ally (Pl. Ex. 34);
10. Jessica Molina (Pl. Ex. 35) (TR 150-153);
11. Julia Arroyo (Pl. Ex. 36) (TR 74-77; 153-156);
12. Gloria Forbes (Pl. Ex. 37) (TR 157-160);
13. Evelyn Horne (Pl. Ex. 38) (TR 160-163);
14. Frantz Cesar (Pl. Ex. 39) (TR 169-172;
15. Jose Gutierrez (Pl. Ex. 40);
16. Glenda Kinlaw (Pl. Ex. 41);
17. Cassandra Armstrong (Pl. Ex. 42);
18. Jessica Aguerra (Pl. Ex. 43);
19. Jennifer Parrilla (Pl. Ex. 44);
20. Niesha Walters (Pl. Ex. 45);
21. Maria Rodriguez (Pl. Ex. 46);
22. Carlos Hildevert (Pl. Ex. 47);
23. Glenda Kinlaw (Pl. Ex. 48);
24. Marcial West (Pl. Ex. 49);
25. Philip Buckerberg (Pl. Ex. 50);
26. Veronica Vanterpool (Pl. Ex. 51).

FCS seized $859,435 in collateral from Zouvelos. (Pl. Ex. 15) (TR 50-52; 76-78; 177.) From that amount, FCS has distributed $619,265 in response to collateral requests. (Pl. Ex. 20, 21) (TR 178-79.) Accordingly, FCS retains $240,220 in collateral to distribute. (TR 180). FCS has issued some checks

that were never cashed, and which have since expired. The total of the expired checks is approximately $19,000. (Pl. Ex. 22 and 23) (TR 182-88.) These checks will need to be reissued and delivered to the applicable indemnitors. (TR 189.)

Padilla discovered 314 bonds for which there was information about the acceptance of collateral, but no information about the return of the collateral. (Pl. Ex. 25) (TR 189-193). The total collateral accepted on these bonds amounts to $365,070. (TR 192-93.) Since there is no information about the disposition of this collateral, FCS reasonably believes that these bonds represent the company's future collateral liability. Thus, FCS anticipates a collateral shortfall of $143,850. (TR 193.)

## III.    NYDFS Investigation

In January and February of 2011, its investigation, NYDFS served Zouvelos with two citations. (Pl. Ex. 53.) In January of 2012, after a hearing, NYDFS attorney Michael Formichelli issued a Post-Hearing Memorandum in which he recommended that Zouvelos' license be revoked in light of evidence that he employed "unfair practices," including "not returning collateral to indemnitors, exceeding the statutory limits on compensation, unlawfully and unreasonably deducting expenses and fees from collateral, failing to return premium money to proposed indemnitors where bail was not posted, [and] requiring indemnitors to enter into an unconscionable contract as a precondition for obtain a bail bond." (Pl. Ex. 54, at 9.) Among other things, Formichelli characterized Zouvelos' private contract with indemnitors as "unauthorized anywhere in the law" and "an unconscionable predatory practice that simply cannot be permitted." (Pl. Ex. 54, at 8).

In January of 2013, an NYDFS Hearing Officer issued a Report and Recommendation in which he also recommended that the Department revoke all licenses issued to Zouvelos. (Pl. Ex. 53) (TR 355-58.)[11] The NYDFS officer found, among other things, that Zouvelos returned collateral to indemnitors in

---

[11] The defendant contests the relevance of the NYDFS documents, arguing that no "inference [may] be drawn from any non-binding dicta" in these reports. (Def.'s Proposed Findings of Fact and Conclusions of Law, ECF 263 ¶ 13.) The reports,

an untimely manner, if at all, that he "withheld money from indemnitors by enforcing...objectionable clauses" in his private contracts, and that he "engaged in untrustworthy conduct by collecting money from the indemnitors' collateral fund to pay the invoices from his wife's company [New York Cut Slips] prior to any forfeiture of the bail bond." (Pl. Ex. 53 at 16-17.) (TR 82-83; 239.)

In August of 2013, the NYDFS accepted the Hearing Officer's recommendation and revoked Zouvelos' license to act as a bail bond agent on the ground that he demonstrated untrustworthiness to act as a licensee within the meaning and intent of the Insurance Law. (Pl. Ex. 19) (TR 349.) The Supreme Court of the State of New York Appellate Division, First Department affirmed the decision below, finding that it was supported by "substantial evidence establishing that [Zouvelos] committed serious misconduct in connection with his bail-bond business." *Zouvelos v. N.Y. State Dep't of Fin. Servs.*, 124 A.D.3d 416, 417, 1 N.Y.S.3d 47, 48 (N.Y. App. Div. 2015), *leave to appeal denied*, 25 N.Y.3d 904, 30 N.E.3d 167 (2015) (TR 358-59.) In particular, the court cited the "record evidence indicating that [Zouvelos] abused his position of power over criminal defendants and their indemnitors by, among other things, refusing to timely return substantial collateral due them and imposing excessive and unsubstantiated fees." *Id.*

## IV. Mancini's Testimony

Mancini affirmed that she signed the 2010 Agreement that gave rise to this litigation. (TR 311.) Additionally, she testified about her involvement with Zouvelos' bail bond business.

Mancini testified that she got involved with NYCT—which is short for New York Cut Slips and Transcripts[12]—in 2009, through her cousin, who started the company. (283-84, 293-94.) She invested "a

---

however, describe aspects of Zouvelos' business operations that bear directly on the question of whether he adhered to the terms of his agreements with FCS, which required him to adhere to New York law. (Pl's Ex. 4, ¶ 3.) Moreover, these reports were introduced into evidence at the request of defense counsel. (TR. 323.)

[12] It is not clear why the company was called New York Cut Slips and Transcripts. When asked to describe what the company does, Mancini stated that "[t]he company is set up to organize the people who mitigate loss. The vendors, the skip tracers, the bounty hunters. All the people that are involved in everything that is not the posting of the bond." (TR 285-86.) She could not

lot" of her "personal money" into the company and opened its bank account. (TR 290, 301.) In 2011, she

took over as its owner and president of the company, which was located in the same office as Zouvelos's

business. (TR 283, 286, 290, 294.) It was not especially clear what this business did. Mancini claimed

NYCT served as a "middleman" between Zouvelos and other third party vendors, including bounty

hunters and couriers, some of whom also worked in Zouvelos's office. (TR 284-86.) Mancini's company

did not deal directly with indemnitors, engage in the actual posting of bail or physical act of loss

mitigation, or have any salaried employees. (TR 285, 291, 298-99.) Zouvelos was the only bail

bondsman for whom Mancini worked. (TR 286.)

Zouvelos served as NYCT's vice president and had access to the company's bank account. (TR

283-84.) He hired the vendors to perform particular services and the vendors requested payment from

Mancini, who submitted invoices to Spartan Bail Bonds for the cost of the vendors' fees plus an

additional fee that NYCT charged for "organizing" the vendors. (TR 285, 287-89, 294-98, 300-01.)

Mancini could not explain why Zouvelos could not simply bill these vendors himself. (TR 297-98.)

Spartan Bail Bonds charged the sum total—the third-party vendor fees plus NYCT's fee—against the

indemnitor's collateral; if the charges exceeded the amount of collateral, Zouvelos billed the indemnitor

for the remainder. (TR 289) (Pl. Ex. 18A, 24, 27-51.) Mancini did not make any effort to determine

whether the charges against indemnitors were lawful or appropriate. (TR 300.) She testified that

Zouvelos "was the one to determine" the charges since he was "the one that sent invoices to the

sureties." (TR 300.)

The plaintiff entered into evidence a March 5, 2012 letter from Mancini to Zouvelos, stating that

NYCT did not have any records pertaining to its business with Zouvelos, Spartan Bail Bonds, or FCS.

(TR 293) (Pl. Ex. 17.) She claimed that she did not have the records because by the time she took

---

explain why the word "transcript" appears in the company's name. (TR 310) ("This is the name they gave it before I was
here.")

control of NYCT in February of 2011, Zouvelos was no longer affiliated with FCS. (TR 293.) Additionally, she testified that she did not retain copies of the invoices she submitted to Zouvelos. (TR 302.) Mancini testified that "sometimes couriers got paid with cash." (TR 303-04.) When asked how she recorded those payments for accounting purposes, she said that it would be "marked along with whatever check they're getting that they also received a certain amount of cash" and that her accountant would review the company's bank statements. (TR 304.) She testified, however, that she did not retain those records. (TR 305.)

## V. Zouvelos' Testimony

### a. Recordkeeping Issues

Zouvelos affirmed that the spreadsheet he created in the course of this litigation reflects information from "whatever available bond files [he] had post-flood," his "bank account statements," and information received from third party vendors. (TR 318-20, 312-13) (Pl. Ex. 18b.) He conceded that the spreadsheet is incomplete, and also conceded that the spreadsheet is inconsistent with the information from FCS's pink collateral receipts; he explained that these inconsistencies were due to the fact that he used his own collateral receipt forms instead of FCS's required forms. (TR 314-19, 388-89, 391, 398-99.)[13] Nevertheless, Zouvelos testified that the spreadsheet captures all information regarding the collateral that he received and returned as of November 2011. (TR 320.)

### b. Third-Party Vendor Fees and Consulting Fees

Zouvelos testified that he set collateral as 15% of the bond amount. (TR 328-29.) He also conceded that New York caps the permissible premium which Zouvelos used to cover expenses "like the light bill and telephone." (TR 329-30.) Zouvelos maintained that he was permitted to charge other fees

---

[13] This testimony contradicts Zouvelos' prior testimony in front of Judge Rosenthal during an injunction hearing, in which he represented that the pink collateral receipts provided FCS with all the information it needed about the bonds that Zouvelos wrote pursuant to their contract. (TR 317.) Zouvelos claimed that after he testified before Judge Rosenthal, he reviewed his bond files and discovered that the only information he could rely on regarding the collateral were his own collateral receipts. (TR 317-18.)

against the collateral because he required indemnitors to execute a separate contract with him. This contract included the following provisions:

> 3....[T]he fees and costs incurred by [Zouvelos] and or vendors concerning the research for and or the underwriting of the bail, enforcement, revocation, and/or a breach of any of the contract or court terms, including but not limited to skip tracing, case tracking, enforcement, investigations, location, apprehension, transportation, housing, upkeep, litigation, administrative and expenses shall be billed at $250.00 per hour per compliance vendor (team of 2 agents minimum per hour) and or 15% of the face amount of bond greater and the skip tracing, case tracking and other investigations will be charged at the rates listed in #15, #16, or #19 of this contract and we agree that any and all costs will be deducted from cash collateral, collateral, or charged on any credit card on file with [Zouvelos] without further notice. If no cash collateral is being held by [the bail bondsman]... WE shall pay any and all unpaid balances upon demand....

> 8...[I]n the event of any enforcement, skip tracing, case tracking, investigations, location, apprehension, transportation, administrative costs, legal fees and reasonable attorney expense...[a]ny and all attorney fees shall be billed at $325.00 per hour by the attorney for [Zouvelos]...If no cash collateral or inadequate collateral is being held by [Zouvelos]...WE agree that WE shall pay any and all unpaid balances upon demand in addition to ___% per month until we do so.

> 15...[N]o one works for free and that the time and effort spent in assisting us with our bail or bail related matter kept [Zouvelos] and vendors from assisting other clients or potential clients and or performing other duties. I/WE agree if the bond is cancelled for any reason whatsoever the minimum cancellation fee is $100 for Bails $1000 and under, $200.00 for bail $1001 and under $2500, $350 for any Bond $2501.00 up to $5000, $460 for Bonds 5001 to $7,499, $650 for bonds $7500 up to $14999. Any bonds exceeding $14,999 will incur the $750 rate and in addition [Zouvelos'] actual...billable time and expenses for Vendor rates as described...Any third party vendor fees not considered statutory premium for couriers and or other vendors on standby are not refundable. Any traveling expenses and waiting time in the court by [Zouvelos] in addition to the aforementioned rates are billed against the collateral and premium...

> 16...[F]or any and all consulting [Zouvelos] and or surety consultant billable hourly rate is $300.00, the billable hourly rate for staff is $125.00,

the billable hourly rate for legal counsel is $325.00 for non court appearances ($425 for in court appearances)...

19....[F]ailure to appear for weekly check in shall result in a minimum enforcement, compliance and investigation fees to be no less than $250.00 per each failure to appear... This charge is separate and distinct from any other enforcement fee and may be due upon demand and or deducted from ay collateral, cash collateral, and/or credit card with [Zouvelos] without further notice or approval.

20....[A]t [his] sole discretion [Zouvelos] may demand additional collateral immediately due and the defendant may be detained and held in custody pending receipt of same...

24....[Zouvelos] reserves the right in [his] sole discretion to change weekly reporting times, dates and frequency for same and to add contract provisions and restrictions for each defendant at [his] sole discretion without any further notification to Us...

27.... [T]he defendant MUST...BE ALWAYS RESPECTFUL AND FULLY COMPLIANT WITH [ZOUVELOS] AND OR VENDORS AND FAILURE to do so CONSTITUTES MATERIAL BREECH [sic] of this contract and [Zouvelos] will REVOKE THE BOND at [his] own discretion without further notice and WILL CAUSE THE IMPOSITION OF COMPLIANCE AND OR ENFORCEMENT FEES WITHOUT ANY RETURN OF PREMIUM, WILL BE CHARGED TO COLLATERAL SECURITY ON DEPOSIT INITIALLY AND OR MAY GENERATE ADDITIONAL AMOUNTS OWED TO [ZOUVELOS] AND OR VENDORS BY US...

45....[T]he defendant must check in to the office designated by [Zouvelos] in person once a week...until the case has ended and the bail has been exonerated and you have produced an[] exoneration letter with the original collateral receipt. Each and every reporting miss to the offices....even after bail is exonerated by the court will be investigated and the applicable charges...will apply until [Zouvelos] is able to confirm a defendant case status utilizing the services of a vendor which We are responsible to pay...

(Pl. Ex. 52) (internal quotation marks omitted) (errors in original).

When asked whether he charged more expenses against larger cash collateral funds than smaller cash collateral funds, Zouvelos testified that he "would charge whatever the contract stated." (TR 331.)

Zouvelos initially claimed that criminal court judges approved his private contract with indemnitors. (TR 331.) (Pl. Ex. 52.) The Court asked whether he was saying "that a judge approved that contract;" Zouvelos replied, "Yes," and went as far as to name a judge that supposedly "approved" his contract. (TR 331-32.) When the Court asked how that judge would respond if asked to verify Zouvelos' claim, Zouvelos backed down and conceded that no judge ever reviewed the "actual exhibit." (TR 333.)

Zouvelos even charged "consulting" fees in instances where he wrote no bond. He conceded that he received a total of $30,260 in fees from five indemnitors for whom he never wrote a bond. (TR 336-37.) He conditioned a return of some of the money on keeping $9,635 for "consulting services." (TR 336-37.) When asked what he was "consulting them about," Zouvelos stated that the bail "violated public policy" because the defendant was "trying to use a police officer as an indemnitor," and Zouvelos "consulted" with the defendant's attorney. (TR 337.) When confronted with the NYDFS hearing officer's report, which indicated that Zouvelos did not return the money because the indemnitors refused to "sign a release against claiming the balance owed," Zouvelos did not "recall…what happened with this specific case;" he stated, "All I know is that the hearing officer did not order this money back." (TR 337-38.)

Zouvelos denied that NYDFS found he misappropriated cash collateral from indemnitors. Plaintiff's counsel referred Zouvelos to the following statement in the NYDFS hearing officer's report and recommendation:

> [Zouvelos c]laimed his right under his unilateral contract with indemnitors and defendants to permit him to charge and collect money out of the collateral fund for many reasons or activities as set forth in the findings of fact. Most of the complainants in this case have substantial or all collateral money misappropriated by the respondent purportedly to pay expenses of workers or vendors employed by his wife's company....The respondent's actions in not returning all the collateral money to indemnitors in the case before me constituted untrustworthy conduct when there were no bail bond forfeitures.

(TR 325) (Pl. Ex. 53). Zouvelos contended that the hearing officer's report represents only that officer's "opinion" of "six bonds out of 10,000 written." (TR 326.) Additionally, Zouvelos denied that he has had problems with other surety companies regarding his management of cash collateral. (TR 320-22.)

### c. Delaying the Return of Collateral to Indemnitors

When asked if it was his practice to delay returning cash collateral to indemnitors, Zouvelos answered: "Pursuant to contract, yes." (TR 326.) Zouvelos testified that he had a policy and practice of holding cash collateral for 120 days after a bond was exonerated, because there is a "statutory waiting period [of] 120 days for the state court to file a judgment against the surety." (TR 333.)[14] Additionally, he demanded that indemnitors sign hold harmless agreements before releasing the funds. (TR. 335-337.) He also admitted that he failed to contact some indemnitors when their checks were ready to be picked up. (TR 347.)

Zouvelos testified that "[i]f [the indemnitors] didn't bring in an exoneration letter and the collateral receipt, they didn't get their collateral returned." (TR 326.) Plaintiff's counsel cited examples in the report and recommendation of cases in which indemnitors complied with the terms of their agreements with Zouvelos, who nevertheless delayed the collateral payments. (TR 326-28.) Zouvelos contended that these delays were justified. (TR 327-28.) In one such case, an indemnitor was instructed to wait 90 days but had not received her collateral after more than two and a half years. (TR 335) (Pl. Ex. 53 ¶ 26.) Zouvelos did not deny the incident, and re-affirmed it was his practice to demand that indemnitors sign release agreements in exchange for any money he returned to them. (TR 335.)

---

[14] Zouvelos admitted that Julio Pozo—who is listed as the general agent on Zouvelos' first contract with FCS—told NYDFS that he wanted Zouvelos to return cash collateral within 30 days. (TR 334.)

### d. License Revocation

NYDFS revoked Zouvelos' bail bond license on August 19, 2013. (TR 348-49.) Zouvelos affirmed that the NYDFS Hearing Office found that Zouvelos' relationship with NYCT presented an inherent conflict of interest, and that his conduct "demonstrated untrustworthiness as a bail bond agent." (TR 348.) He vacated his Baxter Street office and his phone numbers were transferred to another agent, who takes messages from indemnitors seeking their money. (TR 350.) Zouvelos claims the loss of his license has not affected any FCS-insured bonds, and that he has not received calls from indemnitors regarding any outstanding collateral obligations. (TR 351.) Zouvelos explained the failure to identify potential outstanding obligations as follows: "We're dealing sometimes with transient clientele, but whoever picked up their checks picked up their checks…you can't force people to come in and pick up their money and you can't force people to bring their exoneration letter and receipt." (TR 352-53.) Zouvelos contended that indemnitors who have not sought refund of their payments in "six, seven, eight years" are not entitled to their collateral (TR 365); subsequently, he added the caveat that if an indemnitor presented him with a receipt and exoneration letter, he would honor the collateral request. (TR 366.)

### e. The Collateral Shortfall and Bond Forfeiture Judgments

Zouvelos did not dispute that he submitted $859,485 in collateral to FCS. (TR 359.) Additionally, he affirmed that the plaintiff's list of bond forfeiture judgments was accurate. (TR 359-61.) (Pl. Ex. 6.) He denied, however, that he is "solely responsible" for paying the forfeiture judgments; instead, he contended that he is "jointly liable" with other contract indemnitors. (TR 361-62.) He denied that Mancini was his indemnitor. (TR 362-63.)

## DISCUSSION

This Court has subject matter jurisdiction over this contracts dispute because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. As Judge Rosenthal established at the outset of this litigation, FCS's "contractual causes of action arise under Texas common law." *Fin. Cas. & Sur., Inc. v. Zouvelos*, No. CIV.A. H-11-2509, 2012 WL 2886861, at *8 (S.D. Tex. July 13, 2012) (granting motion to transfer venue despite application of Texas law).

"Under Texas law, a breach of contract claim requires: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages to the plaintiff resulting from the defendant's breach." *Senior Living Properties LLC Trust v. Clair Odell Ins. Agency LLC*, No. CIV.A.3:04-CV-0816-G, 2005 WL 1383359, at *3 (N.D. Tex. June 7, 2005) (citing *Kay v. North Texas Rod & Custom*, 109 S.W.3d 924, 927 (Tex. App.-Dallas 2003, no pet. h.). I address each of these elements in turn.

### I. The 2010 Contract Was Valid

The plaintiff argues that the 2010 contract is valid because both defendants signed it, knowingly and voluntarily. The defendants respond that the 2010 contract is void because there was no offer, acceptance, or consideration. (ECF 263, at 13.) Additionally, the defendants argue that the contract does not include a "relation back" clause and thus cannot encompass liability resulting from any "pre-existing duty" that Zouvelos owed FCS. (*Id.*) Similarly, they argue that the plaintiff never created a BUF account in Mancini's name, and that the defendants did not write any bonds pursuant to the 2010 agreement. (*Id.* at 15.)

To establish the existence of a valid contract, a plaintiff must demonstrate five elements: "(1) an offer; (2) an acceptance in strict compliance with the terms of that offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be

mutual and binding." *Senior Living Properties LLC Trust,* 2005 WL 1383359, at *3 (citing *Coffel v. Stryker Corporation,* 284 F.3d 625, 640 n.17 (5th Cir. 2002)). Furthermore, "[a] valid contract is not formed in the absence of bargained-for consideration" and "[t]here is no consideration when the promise at issue is to perform a preexisting duty." *Chapa v. Chase Home Fin. LLC,* No. CIV.A. C-10-359, 2010 WL 5186785, at *3 (S.D. Tex. Dec. 15, 2010) (citing *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 550 (Tex. App.-Dallas, 1991, no writ); 3 Williston on Contracts § 7:39 (4th ed. 2000)).

The contract at issue was an indemnity agreement. "Texas courts construe indemnity agreements under the normal rules of contract construction." *Amwest Sur. Ins. Co. v. Cardenas,* No. 7:12-CV-00146-O, 2013 WL 5729930, at *4 (N.D. Tex. Oct. 22, 2013) (citing *Associated Indemnity Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 284 (Tex. 1998)). Courts must determine "the intention of the parties as evidenced by the language used by them in the indemnity agreement." *Id.* It is "a cardinal rule governing the construction of indemnity agreements that the indemnitor is entitled to have his undertaking strictly construed, and that it cannot be extended by construction or implication beyond its plain meaning." *Id.* (citing *Hudson v. Hinton,* 435 S.W.2d 211, 214 (Tex. Civ. App.-Dallas 1968, no writ)).

In *Amwest Sur. Ins. Co. v. Cardenas,* Judge O'Connor of the Northern District of Texas analyzed a similar indemnity agreement between an insurance company on the one hand, and a contractor and his spouse, on the other. No. 7:12-CV-00146-O, 2013 WL 5729930 (N.D. Tex. Oct. 22, 2013) "Giving the words of the [agreement] their ordinary meaning, and following the maxim of law that, 'as a man binds himself, so shall he be bound," Judge O'Connor found it "apparent that the obligation was intended to protect the indemnitee...against any liability." *Id.* at *5 (N.D. Tex. Oct. 22, 2013) (citing *Russell v. Lemons,* 205 S.W.2d 629, 631 (Tex. Civ. App. 1947), *writ refused NRE*)).

Based on my review of the agreement and application of the ordinary principles of contract construction, I find that the 2010 contract between the plaintiff and the defendants was valid and enforceable. As discussed above, Zouvelos entered into several substantially similar agreements with FCS, each of which expressly "supersede[d] and cancel[led]" the prior agreements. (Pl. Ex. 2 ¶ 33, Ex. 3 ¶ 32, Ex. 4 ¶ 31) (TR 27, 42, 44, 111.) After meeting personally with Padilla, Zouvelos and Mancini signed the final agreement, which listed Zouvelos as a "Producer" and Mancini as a "Producer Indemnitor." (Pl. Ex. 4) (TR 61-63, 111-16, 225, 310.) The contract specified that the "Producer and Producer Indemnitor(s) shall be liable to [FCS] for all liabilities, claims, and demands, without limitation, which arise from or relate to bail bond Powers of Attorney entrusted to Producer by [FCS], regardless of who actually executes said bonds." (Pl. Ex. 4 ¶ 1.) Under the agreement's express terms, the defendants owed the contractual duty to indemnify and hold FCS harmless from any and all losses and liability for forfeitures of any and all bail bonds Zouvelos had written, as well as for losses of collateral attaching to that liability. (Pl. Ex. 4, ¶¶ 7, 9, 14, 17, 18, 24) (TR 29.)

In some cases the addition of an indemnitor shortly before the termination of a contractual relationship might raise concerns about whether the indemnitor entered the agreement with knowledge and intent. Certainly, there are unusual aspects to this final contract. Padilla knew that Zouvelos' business was uncertain and that his practices were questionable, which prompted his visit to New York in May of 2010. Nevertheless, he executed a new contract with Zouvelos and Mancini after that trip, in July. Just a month later, FCS terminated its relationship with the defendants. Standing alone, and without additional context, these circumstances could raise questions of bad faith, or suggest that Mancini was duped into signing the agreement.

The evidence at trial dispelled any such concerns. First, Mancini did not claim that she was duped into signing the contract. Moreover, the evidence demonstrated that Mancini was a full partner

and willing participant in Zouvelos' enterprise. She operated NYCT—a business in name only—in Zouvelos' office and her services amounted to this: other vendors—bounty hunters and the like, who also worked in the same office—would hand their invoices to Mancini, whose sole function was to "organize" them for Zouvelos, a task for which she also took a cut of the indemnitors' collateral. (TR 284-91.) It is little wonder that NYDFS rejected this arrangement as an inherent conflict of interest. (TR 348). Given her hands-on involvement in Zouvelos' business practices, under no circumstances could she be described as unaware of what Zouvelos was doing. On the contrary, Mancini actively participated in and profited from Zouvelos' bail bond business, including the handling and misappropriation of collateral—the very conduct constituting his contract breach. In light of the foregoing, I do not credit the defendants' argument that they did not intend to be bound by the unambiguous terms of the contract.

The defendants also argue that the contract is not valid because FCS President Robert Sabo did not sign it until October 26, 2010—after FCS terminated its relationship with the defendants. (ECF 263, at 15-16) (Pl. Ex. 4, at 10) (Pl. Ex. 26.) The date of Mr. Sabo's signature, however, is not relevant. A contract in itself is an offer, which the offeree accepts by signing the contract. *See* Restatement (Second) of Contracts § 63 (1981) (noting that an acceptance is made and a contract becomes operative when an offeree accepts the offer); *Cantu v. Cent. Educ. Agency*, 884 S.W.2d 565, 567 (Tex. App. 1994) ("[A]n acceptance by any medium reasonable under the circumstances is effective on dispatch, absent a contrary indication in the offer.") (citing Restatement (Second) of Contracts §§ 30(2), 63(a), 65, 66 (1979)). Accordingly, the contract—the offer—was effective when the defendants (the offerees) signed it without making any alterations.

Equally unpersuasive is the defendants' argument that the contract is invalid because there was no consideration. "Lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties." *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App. 2010) (citing Michol

26

O'Connor, O'Connor's Texas Causes of Action 86 (2009)). "The existence of a written contract, however, presumes consideration for its execution;" thus, "the party alleging lack of consideration has the burden of proof to rebut this presumption." *Id.* (citation omitted).

The defendants cite no Texas law. Instead, they point to New York cases for the proposition that a promise to perform a pre-existing legal duty cannot constitute valid consideration. (ECF 263 at 13-14) (citing *Murray v. Northrop Grumann Info Tech., Inc.* 444 F.3d 169, 178 (2d Cir. 2006) (finding that program administrator did not create an "implied-in-fact" contract when it processed participants' applications because the State Department obligated the administrator to process the applications); *Goncalves v. Regent Int'l Hotels, Ltd.*, 58 N.Y.2d 206, 220, 447 N.E.2d 693, 700 (1983) (dismissing breach of contract claim regarding a hotel's failure to provide a safe deposit box because the hotel had a "statutory obligation" to provide the box, and a "statutory obligation cannot be transformed into a contractual performance, nor may [a] statutory right be transformed into a contractual privilege."); *In re Bennett*, 149 B.R. 16, 18 (N.D.N.Y. 1993) (Bankruptcy Court held that the plaintiff had a pre-existing duty to satisfy its obligation to one party whether or not a third party released its lien on the plaintiff's property, thus the third party received no consideration for its promise and no contract was formed); *Vanderbilt v. Schreyer*, 91 N.Y. 392, 402 (1883) (noting that parties may "cancel an existing contract and make a new one to complete the same work at a different rate of compensation" as long as there was "a valid cancellation of the original contract" and holding that a contract was invalid where consideration constituted performance of a prior contract).

Even if New York law applied—and it does not—these cases are inapposite, as Mancini had no pre-existing legal duty to the plaintiff. "An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993) (citing *Russell v. Lemons*, 205 S.W.2d 629, 631 (Tex.

Civ. App.—Amarillo 1947, writ ref'd n.r.e.)). "The agreement creates a potential cause of action in the indemnitee against the indemnitor." *Id.* Accordingly, Mancini's agreement to indemnify Zouvelos constitutes valid consideration. The defendants do not point to any provision in the contract indicating that it would not become effective until Zouvelos wrote bonds pursuant to the agreement, nor do they cite any portion of the agreement requiring that a BUF account be created in Mancini's name. Accordingly, I find that the contract was valid and FCS has a cause of action against both defendants.

II.    Zouvelos Breached the Contracts

The agreements required Zouvelos to use FCS's collateral receipt form, maintain collateral in a fiduciary capacity for FCS, and return collateral to indemnitors once a bond was exonerated. (Pl. Ex. 1 ¶ 7, Pl. Ex. 2 ¶ 7, Pl. Ex. 3 ¶ 7; Pl. Ex. 4 ¶ 7.) Additionally, Zouvelos agreed to retain copies of all collateral receipts, indemnity agreements, and contracts for bail bonds. (Pl. Ex. 1 ¶ 14, Pl. Ex. 2 ¶ 14, Pl. Ex. 3 ¶ 14; Pl. Ex. 4 ¶ 14.) (TR 29.) Further, the agreements specified that Zouvelos would comply with all New York laws, (Pl. Ex. 1 ¶ 3, Pl. Ex. 2 ¶ 3, Pl. Ex. 3 ¶ 3; Pl. Ex. 4 ¶ 3), pay bail bond forfeiture judgments, (Pl. Ex. 1 ¶ 24, Pl. Ex. 2 ¶ 25, Pl. Ex. 3 ¶ 25, Pl. Ex. 4 ¶ 24) and indemnify FCS for all costs, expenses, and liabilities FCS sustained in connection with Zouvelos' bail bond business. (Pl. Ex. 1 ¶¶ 1-2, 7, 17-20; Pl. Ex. 2 ¶¶ 1-2, 7, 17-20, Pl. Ex. 3 ¶¶ 1-2, 7, 17-20; Pl. Ex. 4 ¶¶ 1-2, 7, 17-20.)

Zouvelos breached the terms of the agreements in almost every respect. As discussed above, he did not maintain adequate records about the bonds he issued, the collateral he received, or the collateral, if any, that he disbursed; he did not disclose his private contracts with indemnitors; he failed to return collateral in a timely or reliable manner; he did not indemnify FCS for bond forfeiture judgments; and he "committed serious misconduct in connection with his bail-bond business." *Zouvelos v. N.Y. State Dep't of Fin. Servs.*, 124 A.D.3d 416, 417, 1 N.Y.S.3d 47, 48 (N.Y. App. Div. 2015), *leave to appeal denied*, 25 N.Y.3d 904, 30 N.E.3d 167 (2015) (Pl. Ex. 24, 27-54) (TR 148-149, 152, 176, 182-93.)

Pursuant to the 2010 agreement, Mancini is liable to FCS for damages resulting from these contract breaches. (Pl. Ex. 4 ¶¶ 1, 17-20, 24.)

III.    The Defendants' Counterclaim has No Merit

The defendants assert that FCS owes them $63,802 in unpaid expense reimbursement claims. (TR 126-27) (ECF 263, at 24.) I interpret this counterclaim as an argument that the plaintiff has not performed its part of the bargain. Previously, the defendants asserted a counterclaim for violations of the implied covenants of good faith and fair dealing, arguing that the plaintiff deprived "the defendants of the benefits the defendants are entitled to under the contract, namely, the agreed-upon compensations and reimbursements." (ECF 81 at 9, ¶ 15.) Judge Kuntz granted the plaintiff's motion to dismiss that counterclaim in 2013. (March 27, 2013 Order Granting Plaintiff's Motion, ECF 113.) Now, nearly four years later, the defendants attempt to resurrect the same allegations, claiming that they are entitled to Zouvelos' "consulting" fees and the third-party vendor fees that Zouvelos charged against the collateral.

I agree with the plaintiff that the defendants seek reimbursement for expenses that were fraudulent and improper, as determined by the NYDFS and affirmed by the Appellate Division. *Zouvelos*, 124 A.D.3d at 417, 1 N.Y.S.3d at 48. The defendants have provided no other evidence that FCS failed to perform its end of the bargain. Accordingly, I find that FCS performed and I dismiss Zouvelos' counterclaim.

IV.    The Plaintiff Suffered Damages As a Result of the Defendants' Breach

The agreements provide that Zouvelos and his indemnitors must indemnify FCS for "100% of all reasonable costs, expenses and liabilities that [FCS] may sustain" in connection with the bail bond business, including "bond forfeitures." (Pl. Ex. 1 ¶ 17(c); *see also* Ex. 2 ¶ 17(c); Ex. 3 ¶ 17(c), Ex. 4 ¶ 17(b).) The 2010 Agreement, which was signed by Mancini, lists her as an indemnitor. Accordingly, Zouvelos and Mancini are liable to FCS for the amount of the bond forfeiture judgments

### i. Bond Forfeiture Judgments

At trial, the plaintiff provided a list of forfeiture judgments that FCS paid for bonds that Zouvelos wrote. (Pl. Ex. 5A, 6) (TR 202-04.) Zouvelos admitted that these bonds forfeited, that forfeiture judgments were entered against FCS on each bond, and that FCS paid the judgments. (TR 360-61.) Additionally, he admitted he and his contract indemnitors were liable for any portion of the judgments that were not covered by the funds in his BUF account. (TR 362.)

New York courts entered bond forfeiture judgments against FCS as surety on each of those bonds, causing FCS to pay the Kings County District Attorney's Office $108,750. (Pl. Ex. 7-10) (TR 206-16.) FCS deducted $9,935.00 from Zouvelos' BUF account to cover part of the cost of these judgments. (Pl. Ex. 11-13) (TR 207-08; 213-16.) Thus, FCS's damages pertaining to these bond forfeiture judgments is $98,815.

### ii. Collateral Shortfall

It is reasonable to infer from the discrepancies in the records that Zouvelos mishandled collateral and improperly charged third-party vendor fees against the collateral he collected on FCS-insured bonds. Based on the information available FCS estimates that its collateral shortfall is the difference between the documented unreturned collateral ($365,070 + 19,000) and the collateral it holds ($240,220). (Pl. Ex. 14, 15, 18A, 18B, 20-23, 25) (TR 180, 188-89, 193-201). Thus, FCS's damages resulting from Zouvelos' improper documentation and misappropriation of collateral—in other words the amount of money that FCS might still owe to indemnitors after it pays out all of the collateral it received from Zouvelos—amount to $143,850.

### iii. Total Damages

In total, combining the damages resulting from the bond forfeitures and the collateral shortfall, the defendants' contract breach caused FCS to incur with reasonable certainty at least $242,665 in

damages. (TR 198-99, 204-15.) For purposes of calculating damages arising out of a contract breach, a "reasonable certainty" is sufficient. *Williams v. Gardner*, 215 S.W. 981, 983 (Tex. Civ. App. 1919); *see also Fredonia Broad. Corp. v. RCA Corp.*, 481 F.2d 781, 804 (5th Cir. 1973) ("Damages in a contract action must be based on evidence that affords a sufficient basis for estimating their amount in money with *reasonable* certainty.") (citing *Schoenberg v. Forrest*, 253 S.W.2d 331, 334 (Tex. Civ. App. 1952)). A plaintiff may establish a "reasonable certainty" of loss by showing by presenting "objective facts, figures, or data from which the amount of lost profits can be ascertained." *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (quotation omitted).[15] As discussed above, the plaintiff reviewed Zouvelos' spreadsheets and collateral receipts in order to obtain as accurate an estimate as possible regarding its future liability. By the terms of the agreement, FCS is entitled to recover all costs of liability, including attorneys' fees, accountant fees, expert fees, investigator fees, collection fees, and all expenses and court costs of any kind incurred in connection with this legal proceeding. (Pl. Ex. 4, ¶¶ 7, 9, 14, 17, 18, 24.)

I do not accept the defendants' argument that the agreement does not cover Zouvelos' conduct before the 2010 contract was executed. The contract expressly provided that the "Producer and Producer's Indemnitor(s) [the defendants] shall be fully liable to Company [the plaintiff] for the bonds written by as well as the acts and/or omissions" of Zouvelos and his employees regarding the issuance of bail bonds. (Pl. Ex. 4 ¶ 1.) Moreover, the contract specified that the defendants would indemnify the plaintiff for "any and all damages against it" regarding "any aspect" of their "bail bond business transactions" (*Id.* ¶ 10) and that they would be responsible for "100% of the liability created on bonds posted with the bail bond Powers of Attorney entrusted to Producer [Zouvelos], regardless of who posts

---

[15] The defendants rely on case law from many jurisdictions—none of them Texas—as support for their argument that FCS cannot recover for potential future losses. (Defendants' Proposed Findings of Fact and Conclusions of Law, ECF 263, at 17-19.) These cases do not apply Texas law, nor do they have any bearing on the circumstances at issue here.

said bonds and collateral attaching thereto." (*Id.* ¶ 17.) Finally, the document expressly "supersede[d] and cancele[d] all prior agreements." (Pl. Ex. 4.) Thus, although some of those bonds may have been written prior to the contract, it was clear that the defendants would be required to compensate FCS for liabilities pertaining to all FCS-insured bonds that Zouvelos wrote.

To the extent the defendants contend that Mancini is not liable for Zouvelos' actions, their argument is not supported by the unambiguous terms of the contract. Nevertheless, the defendants are reminded that they are free to divide liability as they see fit. If Zouvelos wishes to pay the judgment in full, he may do so.

## V. The Plaintiff's Fiduciary Duty Claim is Duplicative

In addition to its claim for breach of contract, the plaintiff asserts that Zouvelos is liable for breach of fiduciary duty. This claim is duplicative. "Where, as here, the parties' relationship originated in contract, a plaintiff suing for breach of fiduciary duty must prove that the parties 'created a relationship of higher trust than would arise from [their contract] alone." *Snyder v. Wells Fargo*, 594 Fed. Appx. 710 (2d Cir. 2014) (citations omitted). The plaintiff has not demonstrated that the defendant owed the plaintiff a duty other than that which was expressly established in the contract. Accordingly, this claim is dismissed.

## VI. The Plaintiff's Duty to Return the Collateral

The evidence demonstrated that the defendants breached the contract and are liable to the plaintiff for the damages as set forth above. The evidence also made it plain, however, that the collateral that Zouvelos misappropriated belongs to the indemnitors. Zouvelos "abused his position of power over criminal defendants and their indemnitors by, among other things, refusing to timely return substantial collateral due them and imposing excessive and unsubstantiated fees[.]" *Zouvelos v. N.Y. State Dep't of Fin. Servs.*, 124 A.D.3d 416, 417, 1 N.Y.S.3d 47, 48 (N.Y. App. Div.), *leave to appeal denied,* 25

N.Y.3d 904, 30 N.E.3d 167 (2015). Indeed, the basis of FCS's collateral shortfall claim is that those indemnitors may seek reimbursement from FCS.

Accordingly, within 30 days of this order, the plaintiff is to file a letter that sets forth FCS's plan for identifying and reimbursing indemnitors who have not received the full amount of collateral to which they are entitled.

## CONCLUSION

For the foregoing reasons, I find that the defendants are liable to the plaintiff for damages in the amount of $242,665 plus reasonable attorneys' fees and the costs of litigation.

**SO ORDERED.**

s/Ann M. Donnelly
_____

The Honorable Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
March 29, 2017